**NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-23-0000388
03-OCT-2024
08:12 AM
Dkt. 72 MO**

NO. CAAP-23-0000388

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellee,
v.
JONATHAN P. SPIES, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CASE NO. 3CPC-21-0001004)

MEMORANDUM OPINION
(By:  Leonard, Acting Chief Judge, Hiraoka and Nakasone, JJ.)

In this appeal of a first-degree promoting a dangerous drug (**PDD1**) conviction, Defendant-Appellant Jonathan P. Spies (**Spies**) challenges, inter alia, the admission of the drug analysis and testing over his foundation objection.  Because the required foundation was not laid, the evidence was erroneously admitted, and we vacate and remand for a new trial.

Spies appeals from the June 9, 2023 "Judgment of Conviction and Sentence" (**Judgment**), entered by the Circuit

Court of the Third Circuit (**Circuit Court**),[1] following a jury verdict finding him guilty as charged of PDD1, in violation of Hawaii Revised Statutes (**HRS**) § 712-1241(1)(a).[2]  The Circuit Court sentenced Spies to twenty years of imprisonment, and Spies timely appealed.

On appeal, Spies challenges the Circuit Court's **(1)** admission of the criminalist's testimony of the drug analysis and testing of the recovered substance for lack of foundation showing that, for each of the devices used to weigh and identify the substance, the criminalist had been trained in accordance with each device manufacturer's requirements; **(2)** denial of Spies's Motion to Dismiss due to defective charging; **(3)** determination that Spies's statement to a police officer was voluntarily made and admissible at trial; and **(4)** denial of Spies's multiple motions to suppress the evidence of the recovered substance.[3]  We vacate and remand on the first point of error as it is dispositive.  To provide guidance on remand, we affirm as to the remaining points.

---

[1]     The Honorable Robert D.S. Kim presided.

[2]     HRS § 712-1241(1)(a)(i) and (2) (2014 & 2016 Supp.) provide that possession of one ounce or more of methamphetamine constitutes the Class A felony offense of PDD1.  The Indictment charged that on or about February 14-15, 2021, Spies committed PDD1 by "knowingly possess[ing] . . . substances of an aggregate weight of one ounce or more, containing methamphetamine[.]"  The lab analysis evidence at trial reflected that the substance weighed "33.929 plus or minus .07" grams and contained methamphetamine.

[3]     We have consolidated, reordered, and restated Spies's eight points of error for clarity.

## I.  BACKGROUND

On February 14, 2021, Spies was the target of a narcotics investigation by the Hawaiʻi County Police Department (**HIPD**), which had obtained search warrants of Spies's residence and his person, based on Spies's sale of heroin to an informant at his home.  HIPD conducted a traffic stop of Spies, who was driving a vehicle.  After HIPD executed the search warrant for Spies's person that turned up nothing, the police asked Spies for consent to search his vehicle, and Spies responded that what the police were seeking was in his vehicle.  HIPD seized the vehicle and towed it to the police station; conducted a canine screen of the vehicle resulting in a positive alert; obtained a search warrant for the vehicle based, inter alia, on the canine screen; executed the search warrant for the vehicle; and recovered multiple Ziploc packets of a crystalline substance alleged to be methamphetamine from a black zippered pouch with a checkbook inside, bearing Spies's name.

Pertinent to the dispositive issue on appeal, Spies filed a February 20, 2023 "First Motion in Limine Re: Foundational Requirements for Laboratory Test Results" (**Motion in Limine 1**) that objected to the introduction of any laboratory test results of the substance, absent a sufficient showing of foundation regarding the laboratory technician's training; and argued that the State must show the operator of the drug testing device had "expert training in accordance with manufacturer's requirements."  The Circuit Court denied Motion in Limine 1 without prejudice, and held that it "must look through and determine point by point the qualifications of the expert and the results of the expert report."

3

At the March 29-30, 2023 jury trial, the State called Criminalist Sophia Schiefelbein (**Schiefelbein**) to testify to the drug analysis and testing she conducted on the substance. Schiefelbein testified to her qualifications, and the State proffered her as an "expert in the field of controlled substance analysis and identification." Spies objected, and conducted voir dire of Schiefelbein's qualifications, asking Schiefelbein about the "number of jobs" she has held that do not have "anything to do with narcotics testing, identification or controlled substance analysis"; and her length of training for the devices she used for laboratory testing in this case. Schiefelbein testified that she was trained at the police station; the training course for the balances was less than a day; the Fourier Transform Infrared spectrometer (**FTIR**) training was "approximately a month and a half"; and the ultraviolet (**UV**) spectrometer training was "probably like whole weeks [sic]." Over Spies's renewed objection, the Circuit Court found Schiefelbein to be "an expert in the area of controlled substances and analysis based upon her knowledge, skill, experience and training and her qualifications in the courts of the State of Hawai'i."

Schiefelbein then described how she conducted the drug analysis, and testified that the results of the drug analysis of the "10 packets" was "[t]hat the presence of methamphetamine was confirmed" and the total net weight of the substance was "33.929 plus or minus .07" grams. Spies objected "as to foundation" pursuant to "Motion in Limine 1."[4] Schiefelbein's March 5, 2021

---

[4] Spies objected to the substance weight and identification evidence as follows:

"Official Report [HIPD] Crime Lab" summarizing these findings and test results was also admitted over Spies's lack of foundation objection.[5]

Regarding the devices used in her analysis and testing, Schiefelbein's report indicated that she measured the weight with a "Sartorius MSA1203S balance" (**Sartorius balance**), and she testified that the substance was identified by using the UV spectrometer manufactured by "Agilent" (**Agilent UV spectrometer**), and the FTIR manufactured by "Thermo Scientific" (**Thermo Scientific FTIR**). On cross-examination by Spies's counsel regarding her training for the Sartorius balance, Agilent UV spectrometer, and the Thermo Scientific FTIR, Schiefelbein testified that she was trained by someone at the

---

Q. [(BY PROSECUTOR)] And what was your interpretation of the analysis?

A. [(BY SCHIEFELBEIN)] That the presence of methamphetamine was confirmed.

[DEFENSE COUNSEL]: And I'll object as to foundation per Motion in Limine 1.

THE COURT: Overruled.

Q. (By [PROSECUTOR]) And what was the total net weight?

[DEFENSE COUNSEL]: Your Honor, again I object as to foundation in accordance to [sic] Motion in Limine 1.

THE COURT: Overruled.

[SCHIEFELBEIN]: Um, 33.929 plus or minus .07.

Q. (By [PROSECUTOR]) Is that in grams?

A. Yes.

[5] Only page one of Schiefelbein's two-page report was admitted into evidence.

police station, and had not received training from each device manufacturer, or any certification or accreditation that she had received training in accordance with each device manufacturer's requirements.[6]  On redirect examination, Schiefelbein explained

---

[6]     Schiefelbein testified as follows:

> Q.     [(BY DEFENSE COUNSEL)] Had you ever received any training from someone from Sartorius?
>
> A.     [(BY SCHIEFELBEIN)] No.
>
> Q.     Any training you received on that Sartorius machine came from someone at the police station?
>
> A.     Yes.
>
> Q.     Okay. Did you ever receive any, um, certification or accreditation or any sort of confirmation that you have received training in accordance with the manufacturer's requirements for that machine?
>
> A.     No.
>
> . . . .
>
> Q.     Agilent? Have you ever received any training from someone at Agilent?
>
> A.     For [(gas chromatograph mass spectrometer)] but not UV.
>
> Q.     Thank you. Thank you for clarifying.  With respect to this machine have you ever received any, uh, training from someone at Agilent?
>
> A.     No.
>
> Q.     Any training you received was from someone at the police station?
>
> A.     Yes.
>
> Q.     Did you ever receive any certification or accreditation, uh, indicating that you were trained in accordance with, uh, Agilent's procedures?
>
> A.     No.

that the "crime lab manager" who trained and supervised her, Kathy Pung, "was trained by people from Thermo Scientific," as follows:  "Kathy Pung was trained by people from Thermo Scientific, and we have the manuals from the Thermo Scientific themselves [sic] that are then used to write our procedures which are accredited."  When asked "did you run the FTIR in conformance with the manufacturer's recommendation?", Schiefelbein responded "Yes."[7]  No other pertinent testimony regarding each device manufacturer's training requirements appears in the record.

## II.   STANDARDS OF REVIEW

### A. Sufficiency of Foundation for the Admission of Scientific Evidence

The determination of whether the necessary foundation for the introduction of evidence has been established is within

---

>           Q.     And the FTIR machine [sic] who's the manufacturer?
>
>           A.     Uh, Thermo Scientific.
>
>           Q.     Did you ever receive any training from someone at Thermo Scientific?
>
>           A.     No.
>
>           Q.     All the training you received was from someone at the police station?
>
>           A.     Yes.
>
>           Q.     And did you ever receive any, um, certification or accreditation certificate saying that you have been, uh, trained in accordance with Thermo Scientific, uh, policies?
>
>           A.     No.

[7]     This question specifically asked whether Schiefelbein **operated** the FTIR "in conformance with the manufacturer's recommendation," which is distinct from whether Schiefelbein herself was **trained** in accordance with the manufacturer's requirements, which is at issue in this case.

the discretion of the trial court, and "will not be overturned absent a showing of clear abuse." State v. Subia, 139 Hawai'i 62, 66, 383 P.3d 1200, 1204 (2016) (citation omitted).

### B. Motion to Dismiss

"A trial court's ruling on a motion to dismiss an indictment is reviewed for an abuse of discretion." State v. Metcalfe, 129 Hawai'i 206, 222, 297 P.3d 1062, 1078 (2013) (cleaned up).

### C. Motion to Determine Voluntariness

We review the ultimate issue of the voluntariness of a defendant's statement or confession de novo. State v. Baker, 147 Hawai'i 413, 422, 465 P.3d 860, 869 (2020).

### D. Motion to Suppress Evidence

"An appellate court reviews a ruling on a motion to suppress de novo to determine whether the ruling was right or wrong." State v. Hewitt, 153 Hawai'i 33, 40, 526 P.3d 558, 565 (2023) (cleaned up). Determinations of probable cause are reviewed de novo on appeal. State v. Navas, 81 Hawai'i 113, 122-23, 913 P.2d 39, 48-49 (1996).

### III. DISCUSSION

#### A. The foundation for Schiefelbein's expert qualification was deficient[8] where the record did not reflect that her training to operate the three devices used to weigh and identify the substance was in accordance with each device manufacturer's requirements.

Spies argues that the foundation for admission of the "scientific readings" on the weight and identity of the

_____

[8] We do not address Spies's argument that "reliability for the laboratory and the devices utilized were not shown" because the documents and testimony at trial for laboratory accreditation and device calibration were

substance was "deficient" because "(1) [t]he State failed to show that [] Schiefelbein received training in accordance with the manufacturer's requirements for the three devices utilized to test the weight and substance identification in this case"; and "(2) [t]he State failed to show what the manufacturer's required training is for either of the three devices[.]" Spies asserts that the required foundation in this case of "training in accordance with the manufacturer's requirements" was not met for the three devices at issue here, as follows: (1) the Sartorius balance used to weigh the substance lacked foundation because "[n]o testimony or evidence was provided as to what Sartorious's [sic] training requirements are, and whether anybody at the police station who was conducting training knew of these requirements"; (2) the UV spectrometer manufactured by Agilent, used to identify the substance, lacked foundation because "[n]o testimony or evidence was provided as to what Agilent's training requirements are, and whether anybody at the police station who was conducting training knew of these

---

dated after the March 2021 drug testing date (**testing date argument**). The point of error maintains that all of Spies's foundation objections were preserved in Motion in Limine 1, but the testing date argument does not appear there. See State v. Moses, 102 Hawaiʻi 449, 456, 77 P.3d 940, 947 (2003) ("As a general rule, if a party does not raise an argument at trial, that argument will be deemed to have been waived on appeal[.]"). The docket cites provided in the point reflect Spies's counsel's questioning on device calibration dates and laboratory accreditation dates, but no testing date argument was made below. The docket cites show Spies objected to device calibration and laboratory accreditation exhibits citing "Motion in Limine Number 1," which as we have noted, did not contain the testing date argument. See id.; State v. Wallace, 80 Hawaiʻi 382, 410, 910 P.2d 695, 723 (1996) (holding that "issue of the accuracy of the scale" was "waived" in a PDD1 case, where the defenses's trial objection to "testimony regarding the gross weight of the cocaine did not challenge the accuracy of the certified gram scale"); Haw. Ventures, LLC v. Otaka, Inc., 114 Hawaiʻi 438, 500, 164 P.3d 696, 758 (2007) ("It is unfair to the circuit court to reverse on a ground that no one even suggested might be error." (citation omitted)).

requirements"; and (3) the FTIR manufactured by Thermo Scientific, also used to identify the substance, lacked foundation because "[n]o testimony or evidence was provided as to what Thermo Scientific's training requirements are, and whether anybody at the police station who was conducting training knew of these requirements."

Spies relies on the laser gun foundation cases of State v. Assaye, 121 Hawai'i 204, 216 P.3d 1227 (2009), State v. Amiral, 132 Hawai'i 170, 319 P.3d 1178 (2014),[9] and the drug foundation case of State v. Manewa, 115 Hawai'i 343, 167 P.3d 336 (2007),[10] to argue that: Manewa held "the foundation of the expert's training for a scale to weigh drugs was . . . deficient"; and that the foundation to qualify an expert must include training in accordance with the device manufacturer's requirements, as set forth in Amiral, that "the prosecution is

---

[9] In Assaye, the supreme court held that the prosecution failed to provide "sufficient foundation for the admission of [the officer's] testimony regarding the speed reading given by his laser gun" because the prosecution did not show whether the officer's training met the laser gun manufacturer's requirements, and reversed Assaye's speeding conviction. 121 Hawai'i at 216, 216 P.3d at 1239.

In Amiral, the supreme court held that the officer's testimony was insufficient to establish that his laser gun training met the manufacturer's requirements; and the prosecution "failed to lay an adequate foundation for the introduction of the laser gun reading"; and thus vacated the judgment and remanded to district court for further proceedings. 132 Hawai'i at 179-80, 319 P.3d at 1187-88.

[10] In Manewa, the supreme court vacated Manewa's convictions for first-degree and second-degree promoting a dangerous drug, and held that testimony as to the weight of methamphetamine was inadmissible for lack of foundation as to the accuracy of the balance because the record "fail[ed] to show that there was a manufacturer's accepted procedure for the user of the balance to implement to ensure the balance was in working order." 115 Hawai'i at 357-58, 167 P.3d at 350-51.

required to produce evidence that the nature and extent of an officer's training in the operation of the laser gun meets the requirements indicated by the manufacturer."  Opening Brief at 21 (quoting Amiral, 132 Hawaiʻi at 178, 319 P.3d at 1186 (internal quotation marks omitted)).  Spies's argument has merit.[11]

Hawaii Rules of Evidence (**HRE**) Rule 702 permits "a witness qualified as an expert by knowledge, skill, experience, training, or education" to testify to "assist the trier of fact to determine a fact in issue[.]"  "[B]efore the result of a test . . . may be introduced into evidence, a foundation must be laid showing that the test result can be relied on as a substantive fact."  Subia, 139 Hawaiʻi at 66, 383 P.3d at 1204 (citing Wallace, 80 Hawaiʻi at 407, 910 P.2d at 720).  "A proper foundation for introducing a test result would necessarily include expert testimony regarding:  (1) the qualifications of the expert; (2) whether the expert employed valid techniques to obtain the test result; and (3) whether the measuring instrument is in proper working order."  Id. (cleaned up).

In Amiral, the supreme court explained that to admit a laser gun reading, the prosecution must establish how the laser gun operator's training met the requirements of the laser gun manufacturer, and that the operator received such training, as follows:

---

[11]   The State does not address Spies's argument that training in accordance with the device manufacturer's requirements is a necessary part of the foundation to qualify Schiefelbein, and only argues that Spies waived this argument on appeal by "not rais[ing] the qualifications of Schiefelbein as a point of error."  This is inaccurate because Spies raises the challenge in his first point of error.

> In order to establish a sufficient foundation for the admission of a speed reading from a laser gun, the prosecution is required to produce evidence that the nature and extent of an officer's training in the operation of the laser gun meets the requirements indicated by the manufacturer. To meet this burden the prosecution must establish both (1) the requirements indicated by the manufacturer, and (2) the training actually received by the operator of the laser gun.

132 Hawaiʻi at 178, 319 P.3d at 1186 (cleaned up). Because there was no foundation reflecting the manufacturer's training requirements for the laser gun operator in that case, the trial court erred in admitting the speed reading from the laser gun into evidence. Id. at 179, 319 P.3d at 1187.

The Hawaii Rules of Evidence Manual (**HRE Manual**) similarly explains that a proper foundation for admission of a test result from a scientific device includes a showing that the operator of the device is a "qualified expert," which is met by showing that the expert's training is in accordance with the device manufacturer's requirements, as follows:

> Assuming judicial approval of the general reliability of a scientific machine, admissibility in any particular case will depend upon "a foundation . . . showing that the test result can be relied on as a substantive fact." *State v. Subia*, 139 Hawaii [sic] 62, 66, 383 P.3d 1200, 1204 (2016) (infrared spectrometer used to detect that a substance contained methamphetamine). A proper foundation for such a test result, according to *Subia*, would include (1) a qualified expert (2) employing "valid techniques" to obtain the test result (3) from a machine shown to be in "proper working order." *Id.* That the operator is a "qualified expert" means that her training "meets the requirements indicated by the manufacturer of the device." *State v. Assaye*, 121 Hawaii [sic] 204, 216 P.3d 1227 (2009) (laser speed gun). That the operator used valid techniques means she followed procedures recommended by the manufacturer of the device. *Id.*

Addison M. Bowman, Hawaii Rules of Evidence Manual § 702-2[5][C], at 7-22 (2024-2025 ed.) (emphases added). In accordance with the above, the State in this case had to show

12

that Schiefelbein was trained in accordance with the manufacturer's requirements for the three devices used to analyze and test the substance, to establish foundation that Schiefelbein was a "qualified expert" through whom the evidence of drug identity and weight could be admitted "as a substantive fact." See Subia, 139 Hawaiʻi at 66, 383 P.3d at 1204; Amiral, 132 Hawaiʻi at 178, 319 P.3d at 1186; Bowman, Hawaii Rules of Evidence Manual, § 702-2[5][C], at 7-22.

Here, Schiefelbein testified that she was trained by HIPD. She denied being trained by representatives from the manufacturers of the three devices she used to analyze the identity and weight of the recovered substance. The record does not reflect whether HIPD's training was in accordance with each device manufacturer's requirements, or what the manufacturer's training requirements were for each respective device--the Sartorius balance used to calculate the weight of the substance, the Agilent UV spectrometer used to identify the substance, and the Thermo Scientific FTIR also used to identify the substance. See Amiral, 132 Hawaiʻi at 178, 319 P.3d at 1186. Thus, the State did not lay sufficient foundation to show Schiefelbein's qualifications to operate the three devices used to determine the identification and weight of the recovered substance. On this record, we conclude the Circuit Court acted outside its discretion by admitting Schiefelbein's testimony regarding the identity of the substance as methamphetamine and the total net weight of the substance as 33.929 grams (i.e., over one ounce or 28.35 grams), as substantive facts. See Subia, 139 Hawaiʻi at 66, 383 P.3d at 1204.

Because such evidence was critical to establishing Spies's PDD1 conviction, the erroneous admission of the drug analysis and test results from the Sartorius balance, Agilent UV spectrometer, and the Thermo Scientific FTIR through Schiefelbein's testimony was not harmless beyond a reasonable doubt.  We thus vacate and remand for a new trial.  See Subia, 139 Hawai'i at 63, 383 P.3d at 1201 (vacating and remanding for a new trial in a methamphetamine trafficking case, where the admission of the criminalist's testimony regarding the FTIR test result that the substance contained methamphetamine lacked foundation and was not harmless beyond a reasonable doubt); State v. Long, 98 Hawai'i 348, 355-56, 48 P.3d 595, 602-03 (2002) (vacating and remanding for a new trial in a third-degree promoting of a dangerous drug case, where the admission of the criminalist's testimony regarding the FTIR test result that the substance contained cocaine lacked foundation and was not harmless beyond a reasonable doubt).

**B. The denial of Spies's Motion to Dismiss was not an abuse of discretion.**

Spies argues that the Circuit Court erroneously denied his Motion to Dismiss the charge as "fatally defective" for failure to include the legal definition of the term "possess," which "is more detailed, nuanced, and limited than what a person of common understanding would understand the word 'possess' to mean."

"Whether a charge sets forth all the essential elements of a charged offense is a question of law, which we review under the de novo, or right/wrong, standard."  State v. Wheeler, 121 Hawai'i 383, 390, 219 P.3d 1170, 1177 (2009)

14

(cleaned up).  "[W]here the statute sets forth with reasonable clarity all essential elements of the crime intended to be punished, and fully defines the offense in unmistakable terms readily comprehensible to persons of common understanding, a charge drawn in the language of the statute is sufficient." State v. Basnet, 131 Hawaiʻi 286, 298, 318 P.3d 126, 138 (2013) (citations omitted).

Here, the term "possess" is "readily comprehensible to a person of common understanding[.]"  See id. at 298-99, 318 P.3d at 138-39 (holding that the terms "family or household member" and "physical abuse" are "readily understandable" and need not be defined in the charge).  Knowingly possessing a substance containing methamphetamine with an aggregate weight of one ounce or more is language sufficient to provide notice to Spies.  The Circuit Court did not abuse its discretion in denying the motion to dismiss.  See Metcalfe, 129 Hawaiʻi at 222, 297 P.3d at 1078.

### C. The determination that Spies's statement was voluntary and thus admissible at trial was not erroneous.

Spies argues that the Circuit Court erred by admitting his statement at trial, "Everything that you guys are looking for is in there[,]"[12] as voluntary because Spies was subject to

---

[12]     At trial, HIPD Officer Justin Gaspar (**Officer Gaspar**) testified in pertinent part that:

>     Q.     [(BY PROSECUTOR)] And when you came in contact with, uh, [Spies] did you request consent to search the vehicle, uh, that was near him?
>
>     A.     [(BY OFFICER GASPAR)] Yes.
>
>     Q.     Now, upon doing so was there any response that was initially uttered by [Spies]?

custodial interrogation. **[OB at 5-6]** Spies claims that: "[A]sking to search a vehicle in the context of execution of a search warrant for narcotics has a reasonable likelihood of eliciting an incriminating response and is interrogation."

The Circuit Court's unchallenged[13] findings of fact (**FOFs**) from the "Order Re:  State's Motion to Determine the Voluntariness of Defendant's Statements" reflect that:  when the officers conducted a traffic stop of Spies's vehicle on February 14, 2021, the police had a search warrant to search Spies's person and his home; Spies was seen "walking out of the driver's side door" of the vehicle after the stop; Officer Gaspar informed Spies of the warrant for the search of Spies's person and conducted the search of Spies's person, pockets and clothing, but does not locate anything; based on Officer Gaspar's training, experience, and investigations, Officer Gaspar knew that distributors of controlled substances would commonly keep the substance "on or near their person"; Officer Gaspar asked Spies for consent to search articles in the vehicle that Spies was observed in at the time of the stop; and Spies stated "Its [sic] all in there."

In its Conclusion of Law (**COL**) 21, the Circuit Court correctly concluded, inter alia, citing State v. Rippe, 119

---

A.    Yes.

Q.    And what was that?

A.    Uh, "Everything that you guys are looking for is in there."

[13]    "It is well-established that . . . unchallenged findings of fact are binding upon appellate courts." State v. Rodrigues, 145 Hawaiʻi 487, 497, 454 P.3d 428, 438 (2019) (citation omitted).

Hawaiʻi 15, 22-24, 193 P.3d 1215, 1222-24 (App. 2008), that "[a] request for consent to search the vehicle, without more, is not interrogation." In <u>Rippe</u>, this court held that a "request for consent to search [a] nylon bag did not constitute interrogation" if "there was no prior custodial interrogation," as it only "required a simple 'yes-or-no' answer" and "was not the type of question reasonably likely to elicit an incriminating response." <u>Id.</u> Spies does not claim, and the record does not reflect, that any interrogation occurred before Officer Gaspar asked for consent to search Spies's vehicle. Additionally, similar to <u>Rippe</u>, Officer Gaspar's request "required a simple 'yes-or-no' answer[.]" <u>Id.</u> at 24, 193 P.3d at 1224. Thus, Officer Gaspar's request "was not the type of question reasonably likely to elicit an incriminating response" and did not constitute "interrogation." <u>Id.</u> The Circuit Court did not err in admitting Spies's statement at trial. <u>See</u> <u>Baker</u>, 147 Hawaiʻi at 422, 465 P.3d at 869.

> **D. The denial of Spies's multiple Motions to Suppress the substance recovered from the vehicle was not an abuse of discretion.**

***Search warrant for Spies's person***. While Spies acknowledges that the probable cause affidavit referenced "a controlled narcotics transaction was conducted in the residence of [Spies]" that supported probable cause for a search warrant for Spies's residence, Spies claims there was "no basis" for "a second separate warrant" "to search [Spies]'s person even when not at his residence." Spies argues that the Circuit Court thus erred by denying his "3rd" Motion to Suppress.

Here, the Circuit Court's order denying this motion contained unchallenged findings and conclusions that: "the

informant related that he/she has known [Spies] to be in possession of heroin in the last 72 hours, not that he/she only knows [Spies] to possess narcotics in the home"; "[t]he controlled purchased [sic] proved the reliability of the statement offered by [Spies]"; "the officer describes in his training he has been taught that distributors will use vehicles to facilitate the transaction and . . . that currency and narcotics will be near or around the distributor"; and "[t]he common-sense review of the affidavit to include how distributors work and what the informant relayed to officers establishes sufficient basis for the warrant for the person of Spies."  The Circuit Court's denial of this Motion to Suppress and its determination that probable cause existed for a warrant to search Spies's person were correct.  See Hewitt, 153 Hawaiʻi at 40, 526 P.3d at 565; Navas, 81 Hawaiʻi at 122-23, 913 P.2d at 48-49.

*Spies's detention and warrantless seizure of his vehicle*.  Spies argues the Circuit Court erred by denying his "4th" Motion to Suppress because the "prolonged detention" after the search of Spies's person turned up nothing was unjustified; and the "continued detention of asking to search the vehicle [wa]s a violation of [Spies]'s rights."

Here, the Circuit Court's order denying this motion contained unchallenged findings and conclusions that prolonging Spies's detention after the execution of the search warrant of Spies's person was justified because Officer Gaspar knew the search warrant of Spies's person was based on Spies's alleged heroin distribution; the search warrant of Spies's person turned up no controlled substances; Spies had come out of the driver's

18

seat of the vehicle; Spies said "Its [sic] all in there" when Officer Gaspar asked to search the vehicle; and thus, "Officer Gaspar had probable cause to be believe [sic] that the contraband and evidence would be located within the vehicle which [Spies] was found in just prior to the execution of the warrant on [sic] his person." The Circuit Court also made unchallenged factual-legal determinations that the seizure of the vehicle was justified under the exigent circumstances and automobile exceptions to the warrant requirement where "[t]he car was exposed to public view[,]" posing "a foreseeable risk that the evidence it sheltered might be removed before a warrant could be sought some hours later"; automobiles, because of their mobility, "'may be treated less stringently than a private residence for the Fourth Amendment purposes'" under State v. Elliott, 61 Haw. 492, 496, 605 P.2d 930, 933 (1980); and the "officers had no assurance that if the vehicle was left unattended, persons not in custody would not be able to gain access to it or to the contraband which it contained." Given this record, the Circuit Court did not err in denying the Motion to Suppress on this basis. See Hewitt, 153 Hawai'i at 40, 526 P.3d at 565.

*Canine screen and warrant to search the vehicle*. Spies argues the Circuit Court erred by denying his "5th and 6th" Motions to Suppress the alleged drugs where (1) the canine screen was an unconstitutional intrusion of his vehicle with a "search enhancement device"; and (2) the probable cause affidavit omitted the fact that canine Rory did not train with "negative control samples" and did not provide "sufficient detail of [canine] Rory's alert."

19

Here, the Circuit Court's orders denying these motions contained unchallenged factual-legal determinations that the canine screen was permissible and the probable cause affidavit was sufficient, as follows: Spies told the officers "Its [sic] all in there"; Spies said "It's in the black wallet" and referred to the center console of the vehicle from which he had exited; "[t]he request for consent to search the truck and the dog sniff conducted on the truck were reasonably related in scope" to the officers' initial stop of Spies; "[t]he use of the canine screen was related to this drug investigation and came after [Spies] stated vaguely it is all in there"; "the officers had conducted an arrest of [Spies] and a seizure of his vehicle prior to the canine screen in this case"; "[t]he canine screen took place at the police station while the vehicle was in police custody"; there was "no search" resulting from the canine screen under State v. Groves, 65 Haw. 104, 112, 649 P.2d 366, 372 (1982)[14] because "[s]imilar to luggage, people normally possess an expectation of privacy in a car but not in the airspace surrounding it"; the HIPD canine screening officer and canine Rory "were fully qualified at the time of the screen" consistent with Groves;[15] and their "qualifications were attached to the affidavit in support of the search warrant." On this record,

---

[14] The Groves court held that "there can be no reasonable expectation of privacy in the airspace surrounding a person's luggage." 65 Haw. at 112, 649 P.2d at 372 (citations committed).

[15] In Groves, the supreme court required a narcotics-sniffing dog and handler to "be fully qualified[,]" 65 Haw. at 114, 649 P.2d at 373, meaning "officers and dogs who have participated in established drug enforcement programs." Id. at 114 n.6, 649 P.2d at 373 n.6. The Groves court held that "[w]hen these requirements are met, the results of a 'dog-sniff' can be brought . . . in an application for a search warrant." Id. at 114, 649 P.2d at 373.

the Circuit Court did not err in denying these Motions to Suppress.  See <u>Hewitt</u>, 153 Hawaiʻi at 40, 526 P.3d at 565.

## IV.  CONCLUSION

For the foregoing reasons, we vacate the June 9, 2023 "Judgment of Conviction and Sentence," entered by the Circuit Court of the Third Circuit, and remand for a new trial based on the first dispositive point of error.  We affirm as to all other grounds raised.

DATED:  Honolulu, Hawaiʻi, October 3, 2024.

On the briefs:

Andrew M. Kennedy,
for Defendant-Appellant.

Stephen L. Frye,
Deputy Prosecuting Attorney,
for Plaintiff-Appellee.

/s/ Katherine G. Leonard
Acting Chief Judge

/s/ Keith K. Hiraoka
Associate Judge

/s/ Karen T. Nakasone
Associate Judge